**In re REQUEST OF the GOVERNOR FOR AN ADVISORY OPINION Del. Const. Art. III, § 11.**

**No. 340, 2006.**

Supreme Court of Delaware.

Submitted: Aug. 14, 2006.

Decided: Aug. 24, 2006.

Carl C. Danberg, Esquire, Attorney General, Lawrence W. Lewis, Esquire, State Solicitor (argued), Richard W. Hubbard, Esquire and Erika Y. Tross, Esquire, Deputy Attorneys General, Wilmington, Delaware, attorneys for the affirmative position on the first question presented and the negative position on the second question presented.

Gregg E. Wilson, Esquire (argued), Carol J. Dulin, Esquire and Julie M. Sebring, Esquire, New Castle County Law Department, New Castle, Delaware, attorneys for the negative position on the first question presented and the affirmative position on the second question presented.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices.

TO: The Honorable RUTH ANN MINNER, Governor of the State of Delaware.

Pursuant to Title 10, section 141 of the Delaware Code, you asked the Justices for their opinions regarding the following questions:

1. Whether Article III, section 11, of the Delaware Constitution, which provides that no person shall be appointed to an office within a county who has not resided in that county one year next prior to appointment, applies to either (a) the position of Chief of Police of New Castle County, as appointed by the County Executive of New Castle County, or (b) the position of Public Safety Director of New Castle County, as ap-

pointed by the County Executive of New Castle County?

2. Whether the requirement of Article III, section 11 of the Delaware Constitution that a person appointed to an office within the county shall reside within the County one year next prior to appointment violates either the Equal Protection Clause or Privileges and Immunities Clause of the Fourteenth Amendment of the United States Constitution, as applied to person seeking appointment to the position of Chief of Police or Public Safety Director of New Castle County who has not resided in the County one year prior to appointment?

The Attorney General of Delaware filed briefs in support of an affirmative answer to Question No. 1 and a negative answer to Question No. 2. The New Castle County Law Department filed briefs in support of a negative answer to Question No. 1 and an affirmative answer to Question No. 2.

### Interpreting State Constitutions

Before we address these questions, some historical background and observations about the proper approach to interpreting the Delaware Constitution is helpful. State constitutions differ from the United States Constitution in at least two important respects. First, unlike their federal counterpart, state constitutions are frequently rewritten or amended.[1] Second, unlike their federal counterpart, state constitutional amendments are made in the text of the document rather than added as a series of attachments.[2]

Of the state constitutions written in 1776, Delaware's was the first to be drafted by a convention elected expressly for that purpose.[3] Delaware's Constitution was revised by other conventions in 1792, 1831, and 1897. Delaware's 1897 Constitution has also been amended many times over the last century by legislative enactments passed by two consecutive sessions of the General Assembly.[4]

Although there have been several revisions and many amendments to the Delaware Constitution over the last 230 years, two consistent patterns are ascertainable. First, a great many provisions in Delaware's Constitution have remained the same for more than two centuries. Second, when a provision in the Delaware Constitution has been added, deleted or changed by either a convention or legislative enactment, the reason for the modification has been identified clearly.

The Delaware Bill of Rights provides a good example of provisions in the Delaware Constitution that have remained constant. The present format first appeared in the 1792 Constitution.[5] In providing for the right to trial by jury, the 1792 Constitution stated that it shall be as "hereto-

1. *See* Robert F. Williams, *State Constitutional Law Processes*, 24 Wm. & Mary L.Rev. 169, 198 (1983).

2. *See* Frank P. Grad, *The State Constitution: Its Functions and Form for Our Time*, 54 Va. L.Rev. 928, 942–43, 945–47, 972–73 (1968).

3. *See* George A. Billias, *American Constitutionalism and Europe, 1776–1848*, *in* American Constitutionalism Abroad 13–14, 19–23 (George A. Billias ed., 1990); Donald S. Lutz, *Popular Consent and Popular Control: Whig*

*Political Theory in the Early State Constitutions* 45 (1980).

4. Del. Const. art. XVI, § 1.

5. The Declaration of Rights and Fundamental Rules of the Delaware State was adopted by the convention on September 11, 1776. Shortly thereafter, the first Constitution of the State of Delaware was enacted on September 20, 1776. *See* Gordon S. Wood, *Foreword: State Constitution–Making in the American Revolution*, 24 Rutgers L.J. 911, 921 (1993).

fore."[6] The right that existed "heretofore" in 1792 was the common law right to trial by jury guaranteed by the 1776 Delaware Constitution.[7] The Delaware Bill of Rights remained virtually unchanged in the 1831 and 1897 Constitutions. In fact, the report of the Committee on the Bill of Rights at the 1897 Constitution stated:

> This [Bill of Rights] is regarded, astonishingly and with great unanimity, by the Members of the Convention, as almost the same document. Gentlemen of the Convention are so earnest and anxious that they may transmit this valuable relic of the former centuries to their children and grand-children, and they might point to themselves with pride, that they have left it simply intact, scarcely a dot from the *i* or a cross from the *t* being omitted.[8]

Accordingly, to understand the word "heretofore" in the present Delaware Constitution, one must refer to the Delaware Constitutions of 1831, 1792 and ultimately to the retention of the common law right provided for in Delaware's 1776 Constitution.[9]

The purpose of this brief reference to the Delaware Bill of Rights is to illustrate the significance of knowing the original text, context and evolution of any phrase that appears in the present Delaware Constitution. This is especially important because, as we noted earlier, changes have been made to the text of the Delaware Constitution and not in a series of amendments at the end.

### Provision in Question

You have requested the Justices' opinions regarding the following language that appears in Article III, section 11 of the present Delaware Constitution:

> No person shall be elected or appointed to an office within a county who shall not have a right to vote for a Representative in the General Assembly, and have been a resident therein one year next before his or her election or appointment, nor hold the office longer than he or she continues to reside in the county, unless herein otherwise provided.[10]

### Origin of Provision

The current language in Article III, section 11 of the Delaware Constitution highlights the importance of knowing its original text, context and subsequent modifications. That language originally appeared in the 1792 Constitution as the second part of a long sentence that was divided by a semicolon. Article III in the Constitution of 1792 reads as follows:

> He shall appoint all officers whose offices are established by this Constitution, or shall be established by law, and whose appointments are not herein otherwise provided for; *but no person shall be appointed to an office within a county, who shall not have a right to vote for representatives, and have been an inhabitant therein one year next before his appointment, nor hold the office longer than he continues to reside in the county.*[11]

6. *See* Del. Const. of 1792, art. I, § 4. *See generally Claudio v. State*, 585 A.2d 1278, 1289–90 (Del.1991).

7. *See Claudio v. State*, 585 A.2d at 1290–91.

8. 4 *Debates and Proceedings of the Constitutional Convention of the State of Delaware* 2386 (1958) [hereinafter *"Constitutional Debates"*].

9. *See Claudio v. State*, 585 A.2d at 1289–91.

10. Del. Const. art. III, § 11.

11. Del. Const. of 1831, art. III, § 8 (emphasis added).

This one long sentence clearly referred to the Governor's power to make appointments and created requirements that persons appointed by the Governor had to meet.

The history of the provision in the 1792 Constitution is didactic. The 1776 Delaware Constitution differed from the colonial Charter that it replaced in many respects, but in particular, by providing for more legislative and less executive power.[12] This is not surprising because although colonial "Delaware" had its own General Assembly after 1704,[13] it constituted the Three Lower Counties of Pennsylvania and was subject to the authority of Pennsylvania's Governor as a result of the 1682 Act of Union that was enacted immediately after the arrival of William Penn.[14]

The relationship between the Delaware General Assembly and the various Governors of Pennsylvania, even after the Delaware General Assembly began meeting separately in 1704, was frequently contentious.[15] Indeed, that contention led the Delaware General Assembly to declare its separation from the "union" with Pennsylvania on June 15, 1776, the same day that the Delaware General Assembly authorized its delegates to vote for independence from England.[16] Known up to that point as the Three Lower Counties on the Delaware, the General Assembly marked the separation from its former union with

Pennsylvania by calling its new state "Delaware." [17]

Many states, including Delaware, began rewriting their constitutions almost immediately following the ratification of the United States Constitution.[18] A convention of thirty delegates, ten chosen by the voters of each county, began meeting in Dover in 1791. The most important changes between the 1776 and 1792 Delaware Constitutions concerned the balance of power within State government:

> The delegates agreed that the state constitution of 1776 had made the legislature too strong and the executive too weak. They proposed to strengthen the executive in several ways. Firstly, they adopted the more commonly used name *governor* in place of *president*. They made the governor a popularly elected figure instead of a creature of the legislature, and they eliminated the chief executive's advisory privy council. Under the new constitution the governor had the power to appoint some state officers and he took responsibility for the execution of the laws.[19]

Nevertheless, the 1792 Constitution did not return to Delaware's Governors all the powers that had been enjoyed by the Pennsylvania Governors during Delaware's colonial era as "the Three Lower Counties." For example, under the 1792

---

12. *See* Gordon S. Wood, *Foreword; State Constitution–Making in the American Revolution,* 24 Rutgers L.J. 911, 921 (1993); Randy J. Holland, *State Constitutions: Purpose and Function,* 69 Temple L.Rev. 989, 990 (1996).

13. John A. Munroe, *Colonial Delaware: A History* 113 (2003).

14. *Id.* at 81; *see also* Carol E. Hoffecker, *Delaware, The First State* 87 (1988).

15. John A. Munroe, *Colonial Delaware: A History* 113 (2003).

16. June 15 is now known and celebrated in Delaware as Separation Day. Carol E. Hoffecker, *Delaware, The First State* 86–7 (1988).

17. *Id.* at 87.

18. *See* Willi P. Adams, *The First American Constitutions: Republican Ideology and the Making of the State Constitutions in the Revolutionary Era* 4 (1980).

19. Carol E. Hoffecker, *Democracy in Delaware: The Story of the First State's General Assembly* 59 (2004).

Constitution the Governor was not given power to veto legislation. Nor was the Governor given power to shape policy.

Delaware's contentious experience as the Three Lower Counties under Pennsylvania's colonial Governors was responsible for the original imposition of a durational residency requirement in Article III of the 1792 Constitution as a limitation on the Governor's power to appoint county officers. The 1792 *text* reflects that the words "no person shall be appointed to an office within a county ..." could only mean "no appointment *by the Governor.*" The *context* for the one-year durational residence limitation for the appointment of county offices was colonial Delaware's experience with gubernatorial appointments when it comprised the Lower Three Counties of Pennsylvania and was subject to the executive authority of Pennsylvania's Governors. That same limitation on the Governor's power to appoint county officers was retained by the convention that adopted the 1831 Delaware Constitution.

### 1897 Constitution Revisions

When the Delaware Constitution was revised by the convention process in 1897, two *general* goals were persuasive during the debates of the delegates. The first was to make modifications to the balance of power between the three branches of government. The second was to make the Delaware Constitution more democratic.

Both of those goals were accomplished *specifically* by the revisions to the long sentence providing for gubernatorial appointments that originally appeared in the 1792 Constitution and was retained as section 8 in Article III of the 1831 Constitution. The 1897 Constitution shifted the balance of power between branches by subjecting certain appointments by the Governor to confirmation by a majority of the Senate. The 1897 Constitution also accomplished one aspect of democratic reform by providing for the election of certain county offices that had previously been appointed by the Governor.

In the convention that adopted the 1897 Constitution, the long sentence in section 8 of the 1792 and 1831 Constitutions became the focus of change for two reasons. First, there was a desire to revise the balance of the Governor's appointment power *vis-à-vis* the legislature:

> Changes in Article III were of chief significance because they altered fundamentally the balance of powers in state government by enhancing the authority of the executive branch. ... The delegates ultimately compromised by broadening the power of the executive branch but leaving in place certain constraints on the governor's authority.[20]

This was accomplished by subjecting that authority to Senate confirmation and by requiring that the Governor's future power to appoint any particular position be authorized by the Constitution or by a specific statutory enactment. Second, the 1897 convention was urged by the counties to modify the Governor's appointment power *vis-à-vis* the counties by permitting the voters in each county to elect the holders of certain offices.

The process of accomplishing these goals through changes to the text of section 8 of Article III in the 1792 and 1831 Constitutions is reflected in the Debates of the 1897 Convention. The long sentence from section 8 in the 1792 and 1831 Constitutions was separated at the semi-colon into two sentences. Although the numbers

---

**20.** William B. Chandler, III and Pierre S. duPont, IV, *Executive, Article III, in The Delaware Constitution of 1897: The First One Hundred Years* 101–03 (Randy J. Holland & Harvey Bernard Rubenstein eds., 1997).

changed during the drafting process, those two revised sentences remain the same but now appear as sections 9 and 11 of Article III.

The first part of the sentence from section 8 in the 1792 and 1831 Constitutions was placed in what is now section 9 of Article III and reads as follows: "He or she shall have power, unless herein otherwise provided, to appoint, by and with the consent of a majority of all the members elected to the Senate, such officers as he or she is or may be authorized by this Constitution or by law to appoint." [21] This subjected the Governor's appointments to Senate confirmation. It also limited the Governor's appointment power as authorized by "this Constitution or by law," instead of continuing to empower the Governor to appoint any office that was established by law.

One of the democratic shifts in the 1897 Constitution was accomplished by changing the way that certain county officers attained their respective positions. Prior to the 1897 Constitution, the Governor appointed most county officers. [22] After significant urging by the people, [23] the framers of the 1897 Constitution changed many county positions previously appointed by the Governor into elective offices. [24]

The provision for electing certain county offices was inserted in the second portion of the long sentence in section 8 of the 1792 and 1831 Constitutions that had only previously provided for appointment by the Governor. The second part of the sentence in section 8 of the 1792 and 1831 Constitutions then appeared as the first sentence of what is now section 11 of Article III and reads as follows: "No person shall be elected or appointed to an office within a county who shall not have a right to vote for a Representative in the General Assembly, and have been a resident therein one year next before his or her election or appointment, nor hold the office longer than he or she continues to reside in the county, unless herein otherwise provided." [25] This contemplated that certain county offices would now be elected as provided for in section 22 of Article III, and subjected those offices to the one-year durational residency requirement from the 1792 and 1831 Constitutions. [26]

21. Del. Const. art. III, § 9.

22. 1 *Constitutional Debates* at 736 (Andrew L. Johnson) (taking the position that "we would get better service from the appointments by the Governor than we would probably by elections [of county officers]" and noting that "those officers should be appointed by the Governor"); 3 *Constitutional Debates* at 1911 (Joshua Ellegood) ("[I]n advocating the election of State and county officers, I have been met by the argument that these officers when appointed by the Governor had to be confirmed by three-fifths of the Senate, and that there was no necessity for an election by the people[.]").

23. 1 *Constitutional Debates* at 395 (Charles F. Richards) ("[T]he general desire among the people is that all the officers should be elected.... I believe the people desire that the State and County Officers shall be elected. "); 4 *Constitutional Debates* at 2751 (Joshua A.

Ellegood) ("[T]he people of the State of Delaware say, 'Elect these people.' That has been the cry not only with the prothonotaries, but every other county and State officer.").

24. 1 *Constitutional Debates* at 384 (William C. Spruance).

25. Del. Const. art. III, § 11.

26. The county officers whose election was provided for in section 22, Article III, of the 1897 Constitution were: Prothonotaries, Clerks of the Peace, Registers of Wills, Recorders, Registers in Chancery, Clerks of the Orphans' Court, Sheriffs and Coroners. 4 *Constitutional Debates* at 2743 (President Biggs); 5 *Constitutional Debates* at 3488 (Article III, § 22). The current Delaware Constitution, section 22 of Article III provides that the elected county offices are: Clerks of the Peace, Registers of Wills, Recorders and Sheriffs. Del. Const. art. III, § 22.

There is no doubt that the longer sentence that appeared in section 8 of the 1792 and 1831 Constitutions, regarding the durational residency requirement for county offices, applied only to appointments by the Governor. When the second part of that sentence was placed in section 11 of the 1897 Constitution, the drafters eliminated the semi-colon as well as the word "but." The question is whether that grammatical change was simply a matter of style or was intended to be a substantive change that would subject any future appointment of any county office—not just appointments by the Governor—to the one-year durational residency requirement.

We find the answer to that question in the 1897 Debates regarding the durational residency requirement in section 11 of Article III. When the sentence was divided in 1897 and placed in two separate sections of the 1897 Constitution, it was *a stylistic change only*. The sentence retained the same meaning it had in 1792 and 1831, i.e., the durational residency requirement only applied to county officers who were appointed by the Governor. The Debates reflect that the Secretary of the 1897 Convention read the first seven lines of section 13 (now 11):

> No person shall be elected or appointed to an office within a county who shall not have a right to vote for Representatives in the General Assembly, and have been a resident therein one year next before his election or appointment, nor hold the office longer than he continues to reside

in the county, unless herein otherwise provided.

Then, William C. Spruance noted: "That is substantially the same as in the old Constitution." [27] Thereafter, when discussing section 11, referred to as section 13 in the Debates, there was no objection to continuing the same durational residency requirement for county officers appointed by the Governor. The lack of any discussion or debate confirms that the delegates to the 1897 Convention intended for the scope of this language to remain the same as it had been theretofore.

When the delegates contemplated substantive changes, those changes were clearly identified and debated. For example, one issue of disagreement during the 1897 Constitutional Debates was whether the office of Prothonotary should be elected by the people or appointed by the Superior Court.[28] Prior to the 1897 Constitution, the Governor appointed Prothonotaries.[29] Some delegates to the 1897 Convention thought the court should be given the authority to appoint the Prothonotary because the court was the most qualified to appoint a trained lawyer.[30] Although the office of Prothonotary was not made a court-appointed position in the final version of the 1897 Constitution,[31] the extensive debate over the appointment or election of the Prothonotary illustrates that proposed changes of substance were clearly identified and debated before adoption.

Another example of debates about changing Article III is when J. Wilkins Cooch proposed adding a provision in Arti-

27. 3 *Constitutional Debates* at 1928 (William C. Spruance).

28. 1 *Constitutional Debates* at 384–85.

29. 4 *Constitutional Debates* at 2752 (Joshua Ellegood) ("This Constitution has been in force for sixty-five years, and in all that time I believe the prothonotaries of the State of De-

laware have been appointed by the Governor.").

30. 1 *Constitutional Debates* at 386.

31. 5 *Constitutional Debates* at 3488 (Article III, § 22).

cle III that no clergyman could hold civil office in the State or be a member of the legislature.[32] William Saulsbury successfully argued against its placement in Article III. "[I]f that amendment shall be adopted at all, that is absolutely the wrong place for it. All these sections that we are going over now have treated especially of the Governor and the duties of the Governor."[33] William Spruance suggested that a provision forbidding clergymen from holding public office would best fit under Article XV (Miscellaneous).[34]

Several sections of Article XV (Miscellaneous) refer to public officers in general.[35] If the drafters intended for section 11 to have been significantly broadened to go beyond those offices to which the Governor had appointment authority, a discussion of such a substantive change would have ensued. Moreover, if the delegates to the 1897 Constitution had intended for the one-year residency requirement in Article III, section 11, to apply generally to all county officers appointed by any executive official, they would likely have moved section 11 to Article XV.

### Only Governor's Appointments Limited

As previously noted, the appointment authority and the durational residency requirements found in the first sentence of section 8 in the Delaware Constitutions of 1792 and 1831 were separated and placed in two sections in the Constitution of 1897. There is no evidence that this was done with the intent to broaden the application of the durational residency requirement

beyond appointments by the Governor. The record of the constitutional debates reflects that when the language at issue was adopted in 1897, the delegates believed it to have the same meaning that it had in section 8 of the 1792 and 1831 Constitutions. We have concluded that the history of Delaware's Constitution and the record of the 1897 Debates demonstrate that the language at issue in section 11 of Article III is intended to do what it has always done: impose a one year durational residency requirement to limit only the Governor's authority to appoint county offices.

The Governor can now only make appointments for offices when he or she is specifically authorized to do so by the Constitution or by law. After the 1897 Constitution was adopted, the General Assembly could create positions by law where the Governor did not have appointment authority. With the enactment of Title 9, chapter 11 of the Delaware Code, the power to appoint county officers in New Castle County is now vested "by law" with the County Executive, not the Governor.

### New Castle County Appointments

In 1965, the General Assembly added a new chapter to Title 9 (Counties) of the Delaware Code, reorganizing the New Castle County government.[36] This chapter eliminated the Levy Court and created an elected County Executive, with Council members elected from the various districts, and one elected Council President to

---

32. *Id.* at 3200 (J. Wilkins Cooch).

33. *Id.* at 3200 (William Saulsbury).

34. *Id.* at 3201 (William C. Spruance).

35. Section 2 of Article XV provides that no public officer may collect fees from someone without giving the person a receipt. Section

5 requires all incumbent public officers to hold office until the successor is qualified to assume the position. Section 6 states that all public officers must behave themselves well or face removal by the Governor.

36. Act of May 26, 1965, ch. 85, § 1101, 55 (Part I) Del. Laws 257.

serve at-large.[37] The general powers of the new government were defined in section 1101.

The County Executive, elected at large from the county,[38] is the chief executive officer of the county and is "responsible to the people of the County for the executive and administrative work of the county." [39] Section 1120(a) of Title 9 gave the County Executive the authority to appoint a Chief Administrative Officer. Section 1120(b) originally gave the County Executive the authority to appoint, with the advice and consent of the County Council, the Directors of the Executive Departments of Finance, Planning, Development and Licensing, Public Works, Police, and Parks and Recreation.[40] Section 1120(b) was deleted in 1998.

In 2005, the General Assembly amended section 1120 of Title 9 of the Delaware Code and reinserted section (b), restoring to the County Executive the power to select the heads of the county departments. The preamble to that legislation stated: "in our traditional system of democratic government, an Executive, whether they be the President, the Governor, or the County Executive, is empowered to appoint heads of Executive Branch agencies." [41] Because the County Executive had the power to appoint the heads of the Executive branches prior to the deletion of section 1120(b) in 1998, "present and future County Executives, subject to the advice and consent of County Council, should be empowered to select heads of County departments as former New Castle County Executives were empowered." [42]

Section 1120(b) now provides:

The County Executive, with the advice and consent of the County Council, shall appoint the General Manager of Land Use, the General Manager of Special Services, the General Manager of Community Services, the Chief Procurement Officer, the Chief Financial Officer, the Chief Human Resources Officer, as well as the heads of any subsequently created departments, who shall each serve at the pleasure of the County Executive.[43]

In the same 2005 bill, the General Assembly also amended section 1122 of Title 9, giving the County Executive restructuring power to merge, establish, rename and modify all departments and offices of the County and to prescribe the functions and management systems of all departments and offices in the County, subject to the approval of County Council.[44] The bill was adopted on February 9, 2005.

Article 5, chapter 2, of the New Castle County Code mirrored the provisions of the Delaware Code until November 2005, when the New Castle County Council passed an ordinance restructuring the Police Department and renaming it the Department of Public Safety.[45] The ordinance placed the management of the De-

**37.** Act of May 26, 1965, ch. 85, §§ 1111, 1141, 55 (Part I) Del. Laws 259.

**38.** Act of May 26, 1965, ch. 85, § 1111(a), 55 (Part I) Del. Laws 259.

**39.** Act of May 26, 1965, ch. 85, § 1111(b), 55 (Part I) Del. Laws 260.

**40.** Act of May 26, 1965, ch. 85, § 1120, 55 (Part I) Del. Laws 263.

**41.** H.B. 29, 143d Gen. Assem. (Del.2005).

**42.** H.B. 29, 143d Gen. Assem. (Del.2005).

**43.** Del.Code Ann. tit. 9, § 1120(b) (2006); H.B. 29, 143d Gen. Assem. (Del.2005).

**44.** H.B. 29, 143d Gen. Assem. (Del.2005); Del.Code Ann. tit. 9, § 1122 (2006).

**45.** *See* New Castle County, Del., Ordinance 05–123, § 1 (Nov. 22, 2005).

partment under the authority of the Director of Public Safety and created four divisions within the department: the Division of Police, supervised by the Chief of Police;[46] the Division of Emergency Medical Services, supervised by the Chief of Emergency Medical Services;[47] the Division of Emergency Communications, supervised by the Chief of Emergency Communications;[48] and the Office of Emergency Management, supervised by the Coordinator of Emergency Management.[49] Each division supervisor reports to and is supervised by the Director of Public Safety.[50]

In January 2006, the County Council passed an amendment to the County Code making the Chief of Police an unclassified service position, appointed by the County Executive with the advice and consent of the Council. The amendment provides: "The Chief of Police shall be appointed by the County Executive with the advice and consent of County Council."

### Questions Answered

1. Article III, section 11 only applies to county officers who are appointed by the Governor. The General Assembly has vested the County Executive of New Castle County with authority to appoint the Chief of Police of New Castle County and the Public Safety Director of New Castle County. Consequently, the one-year durational residency requirement in Article III, section 11 does not apply to either of those appointed county positions.

2. Our answer to the first question makes it unnecessary to address your second question.

---

46. New Castle County, Del., Code art. 5, ch. 2, § 2.05.201(1)(a) (2005).

