IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL CAPRIGLIONE, | § | |
| | § | |
| Respondent Below, | § | |
| Appellant, | § | No. 138, 2021 |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, ex rel. | § | |
| KATHLEEN JENNINGS, | § | C.A. No. N21C-04-091 |
| ATTORNEY GENERAL, | § | |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: July 14, 2021
Decided: October 1, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court. **REVERSED**.

Stephani J. Ballard, Esquire, LAW OFFICES OF STEPHANI J. BALLARD, LLC, Wilmington, Delaware, *for Appellant Michael Capriglione*.

David C. Skoranski, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice for the Majority:

On April 5, 2021, Michael Capriglione was elected to a two-year term as a Commissioner of the Town of Newport. On the eve of his swearing-in ceremony, the Attorney General, on behalf of the State of Delaware, petitioned for a writ of *quo warranto* in the Superior Court. The State contended that Capriglione was prohibited from serving as a Commissioner because he had been convicted of misdemeanor official misconduct for actions he took as Newport's police chief in 2018. That offense, the State argued, was a disqualifying "infamous crime" under Art. II, § 21 ("Section 21") of the Delaware Constitution. The Superior Court stayed Capriglione's swearing in to resolve this question and eventually held that he was constitutionally barred from holding public office.

We considered Capriglione's appeal on an expedited basis, hearing oral argument on July 14, 2021. On July 16, we issued an order reversing the Superior Court and allowing Capriglione to take the oath of office.[1] In this opinion, we explain our reasons for doing so. We hold that, under Section 21, only felonies can be disqualifying "infamous" crimes.

---

[1] *Capriglione v. State*, 256 A.3d 207, 2021 WL 3012671, at *1 (Del. July 16, 2021) (TABLE) [hereinafter *Capriglione (Order)*].

2

I

A

In May 2018, video surveillance captured Capriglione, Newport's then-police chief, backing his police vehicle into a pickup truck in the department's parking lot. Capriglione did not report the incident.[2]  A few days later, Capriglione ordered a "reset" of the town's video-surveillance system purportedly to address an ongoing malfunction.[3]  The reset deleted the previous two weeks of surveillance, including the footage of the parking-lot incident.[4]  In authorizing the reset, Capriglione rejected a second remedial option that would have corrected the malfunction and preserved all existing data.[5]

In June 2018, the State sought and obtained a grand jury indictment against Capriglione for four offenses: (1) failure to provide information at the scene of a collision, (2) careless driving, (3) tampering with physical evidence, a Class G felony, and (4) official misconduct, a Class A misdemeanor.[6]  The first two counts allege violations of the Delaware Motor Vehicle Code, while the latter two allege violations of the Delaware Criminal Code.

---

[2] App. to Opening Br. at A18.
[3] *Id.*
[4] *Id.* at A120.
[5] *Id.*
[6] Capriglione's indictment for misdemeanor official misconduct was under 11 *Del. C.* § 1211. The indictment, in pertinent part, read: "Michael Capriglione . . . while being a public servant, intending to obtain a personal benefit, committed an act, constituting an unauthorized exercise of official functions, knowing that the act is unauthorized." App. to Opening Br. at A17.

3

The parties reached an agreement under which Capriglione pleaded guilty to careless driving and official misconduct and the State agreed to enter a *nolle prosequi* on the remaining charges, including the felony tampering count.[7] Capriglione also agreed to surrender his Council on Police Training certification and refrain from seeking further certification.[8] In the written plea agreement, Capriglione acknowledged that he had "ordered the deletion of a surveillance video, which depicted him striking another vehicle in the parking lot of [the] Newport Police Department."[9] Capriglione was sentenced to one year of probation and ordered to pay approximately $3,800 in restitution.[10]

Two years later, Capriglione decided to run for an open Commissioner position in Newport. Newport's Charter, consistently with 15 *Del. C.* § 7555(c)(1), prohibits felons from serving as a Commissioner.[11] But Capriglione's official misconduct conviction was a misdemeanor, and he was elected on April 5, 2021, earning 32 votes, the most of the four Commissioners-elect.[12]

---

[7] App. to Opening Br. at A18.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Charter of Newport, § 3-05. Ex. C. to Opening Br. at 5. Section 7555(c)(1) bars felons from municipal public service unless a town's charter says otherwise. 15 *Del. C.* § 7555(c)(1).
[12] App. to Opening Br. at A82, 91.

The Delaware Attorney General brought this action on behalf of the State on April 14, 2021, seeking a stay of Capriglione's swearing in—scheduled for the next day—and a writ of *quo warranto*[13] to nullify his election.[14]  The Superior Court granted the stay and considered the parties' filings as cross-motions for summary judgment.[15]

On May 4, the Superior Court, recognizing that the question before it was both difficult and consequential, held that Capriglione was constitutionally barred from holding public office.[16]  It observed that this Court had never squarely addressed the question of whether a misdemeanor can be an "infamous crime" under Section 21.[17]

---

[13] The writ of *quo warranto* "is a remedy that is essentially adversarial in nature that seeks to remove the challenged officer from a position. The writ or order is like a summons commanding the respondent to show by what authority he or she claims to hold an office and is, in effect, an order to show cause." 65 Am. Jur. 2d *Quo Warranto* § 2 (Feb. 2021).  As Justice Woolley explained in 1911, a "writ of quo warranto was in the nature of a writ or right for the king against him who claimed or usurped any office, franchise, or liberty, to inquire by what authority he supported his claim, in order to determine the right. . . .  By the fiction of feudal law the king was the fountain whence all franchises were derived, the exercise of any of which without regal grant was considered a usurpation of the king's prerogative. Hence the writ of quo warranto became a prerogative writ that issued of right, wherein the king, being the sole party in interest, instituted the action in his own name, in his own right, by his Attorney General." *Brooks v. State*, 26 Del. 1, 36, 40 (Del. 1911).

[14] Pet. for Writ of *Quo Warranto* ¶ 2.  App. to Opening Br. at A6–7.

[15] *State ex rel. Jennings v. Capriglione*, 2021 WL 1784084, at *3 (Del. Super. Ct. May 4, 2021). The Superior Court noted that *quo warranto* proceedings involve the issue of whether an official who has been elected and already assumed public office has the right to remain in office. Observing that this case involved the distinguishable question of whether Capriglione had the right to assume the office he was elected to, the Superior Court treated the State's petition as a motion for declaratory judgment and decided the matter—without objection from the parties—"as though the parties [had] filed cross-motions for summary judgment." *Id.*

[16] *Id.* at *1.

[17] *Id.* at *4.

The court also distinguished as *dicta* other Superior Court cases that indicated that only felonies can be disqualifying.[18] It then conducted a totality-of-the-circumstances analysis and held that Capriglione's misdemeanor conviction was "infamous" because it involved dishonesty and "amount[ed] to a breach of the public trust" in light of Capriglione's position as police chief.[19]

We heard Capriglione's appeal on an expedited basis and reversed the Superior Court, allowing him to be sworn in.[20] After considering the historical understanding of Section 21, the longstanding interpretation of the provision by this Court and the Superior Court, and the General Assembly's activity in this area, we hold that only felonies can be disqualifying "infamous" crimes under the Delaware Constitution.

## II

This Court reviews the trial court's ruling on a motion for summary judgment *de novo*.[21] We review questions of law and constitutional claims *de novo*.[22]

---

[18] *Id.* at *4–6.

[19] *Id.* at *8.

[20] *Capriglione (Order)*, 2021 WL 3012671, at *1.

[21] *Furman v. Del. Dep't of Transp.*, 30 A.3d 771, 773 (Del. 2011) (quoting *Ramirez v. Murdick*, 948 A.2d 395, 399 (Del. 2008)).

[22] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 661 (Del. 2014) (citing *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258 (Del. 2011); *Lambrecht v. O'Neal*, 3 A.3d 277, 281 (Del. 2010)).

## III

"Any analysis of a Delaware Constitutional provision begins with that provision's language itself."[23] Our task is to ascertain both the intent of the delegates to the Constitutional Convention of 1897 and the original public meaning of the language at issue.[24] When the historical understanding of the provision is not dispositive, "we next turn to precedent[.]"[25] In doing so, we consider the decisions of this Court and any well-developed decisional law of our State's lower courts.[26]

### A

### 1

We begin, as the Superior Court did, with the text of Section 21. To the extent that the meaning of the text is not self-evident, we turn to the records of the Constitutional Convention of 1897 and other historical sources to determine how the framers intended the provision to operate and how the people of Delaware would

---

[23] *In re Request of Governor for Advisory Opinion*, 950 A.2d 651, 653 (Del. 2008) [hereinafter *Advisory Opinion (Pepukayi)*].

[24] *Id.*; *In re Request of Governor for an Advisory Opinion (Del. Const. art. III, § 11)*, 905 A.2d 106, 108 (Del. 2006) ("The purpose of this brief reference to the Delaware Bill of Rights is to illustrate the significance of knowing the original text, context, and evolution of any phrase that appears in the present Delaware Constitution.").

[25] *Advisory Opinion (Pepukayi)*, 950 A.2d at 653.

[26] *LG Electronics, Inc. v. InterDigital Comms., Inc.*, 114 A.3d 1246, 1249 (Del. 2015); *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 (1975) (explaining that the "longstanding acceptance by the courts" of a single interpretation, and the legislature's "failure to reject" it, favored approval of the interpretation.); *see also Blau v. Lehman*, 368 U.S. 403, 414 (1962) (holding that the legislature "is the proper agency to change an interpretation [] unbroken since its passage.").

have understood its language at the time of its adoption.[27] This exercise leads us to conclude that the framers understood Section 21 "infamous crimes" to include only felonies and offenses punishable by multiple years in prison.

> Section 21 provides:
>
> No person who shall be convicted of embezzlement of the public money, bribery, perjury or other infamous crime, shall be eligible to a seat in either House of the General Assembly, or capable of holding any office of trust, honor or profit under this State.

Two textual features of Section 21 are noteworthy.

First, although the delegates provided elsewhere in the Constitution that "any high crime or misdemeanor" could support impeachment of a public official,[28] the text of Section 21 does not go so far.

Second, Section 21 enumerates three specific disqualifying offenses— "embezzlement of the public money,[29] bribery,[30] [and] perjury[31]"—each of which carried a multi-year jail sentence in 1897 or was a felony. The natural reading of

---

[27] *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 642 (Del. 2017).

[28] Del. Const. art. VI, § 2.

[29] Del. C. 1852, ch. 153, vol. 16, §§ 1–2 (1893) (prescribing up to ten years' imprisonment for those convicted of embezzlement).

[30] Del. Const. art. V, § 7 (prescribing up to three years imprisonment for those convicted of bribery related to elections); *see also State v. Collins*, 17 Del. 420 (Del. Gen. Sess. 1898) (stating that in "the first case under the new constitution," defendant guilty of election bribery faced up to three years in prison).

[31] Del. C. 1852, Ch. 130, § 1 (1893) (defining perjury as a felony).

"other infamous crime," then, is as a reference to serious offenses punishable by felony status or more than one year in prison.[32]

The convention debates support this inference. Although the discussion of Section 21 itself was brief,[33] the delegates fixed their attention on the meaning of "infamous crime" when they debated Art. XV, § 6 ("Section 6"), which provides that "[t]he Governor shall remove from office any public officer convicted of misbehavior in office or of any infamous crime." As a textual matter, the separate enumeration of "misbehavior in office" and "infamous crime" indicates that the framers saw the offenses as distinct; otherwise, one or the other would be surplusage. Delegate William C. Spruance echoed this reading, explaining that "misbehavior in office may not necessarily be an infamous crime."[34] As examples of what would

---

[32] Under the *ejusdem generis* canon, courts will interpret a general term (here, "other infamous crime") to reflect the class of objects described by the more specific terms accompanying it. William N. Eskridge, *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 408 (2016). Another oft-cited treatise has noted that the *ejusdem generis* canon "often gives rise to the question how broadly or narrowly to define the class delineated by the specific items listed. . . . The court has broad latitude in determining how much or how little is embraced by the general terms." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 207 (2012).

[33] 3 *Debates and Proceedings of the Constitutional Convention of the State of Delaware* 2257 (1958) [hereinafter *Delaware Constitutional Debates*]; *see also* 4 *Delaware Constitutional Debates* 2886. William Saulsbury of Dover introduced Section 21 and began the short debate:
> WILLIAM SAULSBURY: This section is entirely new matter. We have at present no Constitutional provision on the subject.
> EDWARD G. BRANFORD: The same provision is found in many of the constitutions of the states. It seemed to the Committee to be an eminently wise and proper one.
> WILLIAM SAULSBURY: It is only new to our Constitution.
> CHAIRMAN COOCH stated the question on agreeing to the section.
> Whereupon [Section 21] was adopted

[34] 4 *Delaware Constitutional Debates* 2969.

9

constitute an "infamous" crime he listed larceny and robbery, two common-law felonies.[35]

Spruance also told his fellow delegates that "[t]here would be no difficulty in discovering what were infamous crimes[.]"[36]  Although this dispute may seem to refute that prediction, it is also the case that the 1880s and 1890s saw a growing national consensus about the meaning of "infamous crime."  The United States Supreme Court drove this understanding with a series of decisions interpreting the Fifth Amendment to the federal Constitution, which guarantees that "[n]o person shall be held to answer for a capital, or otherwise *infamous crime*, unless on a presentment or indictment of a Grand Jury[.]"[37]  In 1885, the Court held in *Ex parte Wilson*[38] that "a crime punishable by imprisonment for a term of years at hard labor is an infamous crime[,]" thus requiring an indictment for prosecution.  It repeated this standard twice in the next decade.[39]  And while the convention debates on Sections 6 and 21 do not refer to the federal definition of "infamous crime," most of

---

[35] *Id*. at 2968; *see* Del. C. 1852, vol. 13, § 14 (1893) (defining larceny as a felony).  At common law, robbery—which is a larceny accompanied by actual or threatened force—was also a felony. *State v. Campbell*, 22 A.2d 390 (Del. Gen. Sess. 1941) ("Robbery at common law has been defined as 'the felonious and forcible taking from the person of another good or money of any value, by violence or putting him in fear.'").

[36] *Id*. at 2968.

[37] U.S. Const. amend. V (emphasis added).

[38] *Ex parte Wilson*, 114 U.S. 417, 429 (1885).

[39] *Parkinson v. United States*, 121 U.S. 281 (1887) ("imprisonment [] for a period longer than one year . . . makes the crime infamous[.]"); *In re Bonner*, 151 U.S. 242, 254 (1894) ("infamy is attached" to "imprisonment [] for a period longer than one year, or at hard labor.").

the delegates were trained in law,[40] and the *Wilson* line of cases impacted all federal defendants, leading to national attention.[41]

In our view, the constitutional text and the historical evidence of its understanding strongly suggest that Section 21's "infamous crimes" bar did not encompass offenses that were not felonies or punishable by more than one year in prison. That said, we recognize that the evidence is not so conclusive as to establish a definitive—and case dispositive—historical understanding. We therefore address next the State's historical arguments, and then turn to the large body of Delaware case law that has interpreted Section 21.

2

The State urges us to adopt the interpretation of "infamous crimes" endorsed by the supreme courts of Pennsylvania and Arkansas. Both states have similar constitutional provisions, and we have recognized that the decisional law of other states may be persuasive, especially when there is a "historical convergence" between the laws or constitutional provisions at issue.[42] Here, however, there is no

---

[40] Randy J. Holland, *The Delaware State Constitution* 23–24 (2d ed. 2017) ("The delegates to the Convention were a more diverse group than were present at previous conventions. There were fewer members involved in public service. Only ten of the delegates had served in the General Assembly prior to the Convention. Law continued to be the primary avocation of many of the delegates, but there were also numerous businessmen, farmers, three doctors, and two preachers.").

[41] *See Criminal Procedure – Effect of Erroneous Sentence*, 9 Harv. L. Rev. 220 (1895); *Criminal Procedure – Excessive Sentence – Habeas Corpus – Jurisdiction*, 9 Harv. L. Rev. 287 (1895); *Recent Cases*, 7 Yale L. J. 141 (Dec. 1897).

[42] *Juliano v. State*, 254 A.3d 369, 378–379 (Del. 2020) (citing *Jones v. State*, 745 A.2d 856, 866 (Del. 1999)); *see* Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American*

such convergence, because Pennsylvania and Arkansas adopted their "infamous crime" bars long before Delaware enacted Section 21, and in a different historical context. We therefore decline to follow the lead of either state.

Arkansas enacted its "infamous crime" disqualification provision in 1874.[43] The provision predates the *Wilson* line of cases, where the U.S. Supreme Court developed a definition of "infamous crime" in the context of the federal Fifth Amendment's grand jury guarantee. The Arkansas Supreme Court recognized the significance of this in *State v. Oldner*:[44]

> Appellee also relies on several federal cases which have interpreted an infamous crime consistent with the historical context that a crime is infamous if it is punishable by imprisonment of more than one year. . . . While Oldner's argument might seem persuasive at first blush, it ignores the fact that [] the Supreme Court's decision in *Wilson* was handed down more than a decade after our most recent Constitution was drafted.

Thus, while *Oldner* held that felonies and non-felony *crimen falsi*[45] offenses could be disqualifying under the Arkansas Constitution, its interpretation was rooted in a different constitutional history than our own. The same is true of Pennsylvania,

---

*Constitutional Law* 17 (2018) (discussing state-specific traditions and their potential impact on constitutional interpretation).

[43] Ark. Const. of 1874, art. 5, § 9.

[44] *State v. Oldner*, 206 S.W.3d 818, 823 (Ark. 2005).

[45] The *crimen falsi* classification dates to Roman law and is generally understood to describe crimes "the commission of which involve[] some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." *Gregory v. State*, 616 A.2d 1198, 1204 (Del. 1992) (internal citations and quotation marks omitted).

which also enacted its "infamous crime" bar in in 1874, eleven years before *Wilson* was decided and 23 years before Delaware ratified Section 21.[46]

We decline to follow Pennsylvania's case law in this area for two more reasons. First, the "seminal case" cited by the State—*Commonwealth v. Shaver*[47]—interpreted an old disqualification provision that bears little textual similarity to Delaware's Section 21. Article VI, § 9 of Pennsylvania's Constitution of 1838[48] provided:

> All officers for term of years shall hold their offices for the terms respectively specified, only on the condition, that they so long behave themselves well; and shall be removed on the conviction of misbehavior in office, or of any infamous crime.

In *Shaver*, the Supreme Court of Pennsylvania held that "infamous crimes" were those that rendered citizens "incapable of being a *witness* or *juror*," and that disqualifying offenses included "treason, felony, and every species of the *crimen falsi*."[49] The textual differences between this provision and Section 21 are critical: according to *Shaver*, bribery was not disqualifying because "[bribery has] never been held to render persons, convicted thereof, infamous or incapable of giving evidence

---

[46] Pa. Const. of 1874, art. II, § 7; *see In re Braig*, 590 A.2d 284, 286 (Pa. 1991).

[47] *Commonwealth v. Shaver*, 3 Watts & Serg. 338, 1842 WL 4918, at *3 (Pa. 1842).

[48] Pa. Const. of 1838, art. VI, § 9.

[49] *Shaver*, 1842 WL 4918, at *4 (emphasis in original) (listing as *crimen falsi* offenses "such as forgery, perjury, subornation of perjury, attaint of a false verdict, and other offenses of the like description, which involve the charge of *falsehood, and affect the public administration of justice*.").

13

or serving as jurors."[50] This conclusion makes little sense in Delaware, because bribery is an enumerated offense in Section 21.

The second reason we decline to follow *Shaver* is that the Supreme Court of Pennsylvania has consistently altered and re-articulated its holding in that case. In 1987, for instance, the Court explained that *Shaver* was not "sufficiently inclusive for the modern era."[51] In 2000, it repeated this observation[52] and decided that *Shaver*'s holding that "infamous crimes" were those that disqualified citizens from jury service was not good law; instead, only *Shaver*'s classification of *crimen falsi* offenses as "infamous" still controls.[53] This was significant because, in Delaware, misdemeanants are allowed to serve on juries; the only criminal disqualification is for "convicted felons who have not had their civil rights restored."[54] In any case, the shifting readings of *Shaver* suggest that it does not supply the true historical meaning of "infamous crimes."

To be clear, we do not criticize the jurisprudence of our sister courts in Arkansas and Pennsylvania. Instead, we simply find that their interpretations of

---

[50] *Id.*

[51] *Petition of Hughes*, 532 A.2d 298, 302 (Pa. 1987).

[52] *Com. ex rel. Baldwin v. Richard*, 751 A.2d 647, 653 (Pa. 2000) ("[W]e have held that the definition espoused in *Shaver* was 'not sufficiently inclusive for the modern era[.]'") (internal citation omitted).

[53] *Id.* (citing *Shaver* but rejecting "a mechanical rule whereby we deem a crime infamous solely on the grounds that it disqualifies one from serving as a juror.").

[54] 10 *Del. C.* § 4509(b)(6).

14

"infamous crimes" do not necessarily reflect the historical meaning of Delaware's Section 21.

B

Because the text and historical understanding of Section 21 do not answer the question before us conclusively, "we next turn to precedent to help us determine the meaning of 'infamous crime.'"[55] In this step, we consult not only our own decisions but also the decisions of our State's trial courts, which are entitled to special weight when they establish a longstanding interpretation that the legislature has failed to question.[56] That exercise reveals that, before this case, Delaware's Section 21 jurisprudence uniformly indicated that only felonies can be infamous crimes. And although we have never explicitly announced this rule as a holding, we do so today.

The Superior Court first considered the scope of Section 21's "infamous crime" disqualifier in 1970, when General Assembly candidate Johnny B. Johnson sought to have his conviction for grand larceny stricken from the records of the court.[57] Sitting as a panel, President Judge Stiftel and Judge Christie held that Johnson had satisfied the statutory requirements for his request and ordered the

---

[55] *Advisory Opinion (Pepukayi)*, 950 A.2d at 653.

[56] *Id.*; *LG Electronics, Inc. v. InterDigital Comms., Inc.*, 114 A.3d 1246, 1249 (Del. 2015); *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 (1975) (explaining that the "longstanding acceptance by the courts" of a single interpretation, and the legislature's "failure to reject" it, favored approval of the interpretation.); *see also Blau v. Lehman*, 368 U.S. 403, 414 (1962) (holding that the legislature "is the proper agency to change an interpretation [] unbroken since its passage.").

[57] *State v. John Brice Johnson*, 270 A.2d 537 (Del. Super. Ct. 1970).

conviction struck.[58]  The Court noted, however, that Johnson had been arrested on suspicion of another larceny during his probation period, although no conviction was recorded.[59]  Thus, two days later, the panel ruled from the bench that "an infamous crime, as that phrase is used in our Constitution (Art. 2, Sec. 21), includes only felony convictions, without deciding that all felony convictions are necessarily infamous."[60]  This decision clarified that Johnson's larceny arrest did not disqualify him under Section 21.  The Superior Court then confirmed in an opinion that Johnson was eligible to seek public office.[61]

In *Fonville v. McLaughlin*,[62] we reversed and held that Johnson was disqualified from holding public office.  We decided, first, that Section 21 only applies to final judgments of conviction—rather than verdicts or pleas that are not yet final—because "as used in this constitutional provision creating a disability of citizenship, the word is to be construed in its narrow sense[.]"[63]  We then held that the striking of Johnson's conviction from court records did not vacate it.[64]  Thus, Johnson's felony grand larceny conviction was still subject to Section 21 review,

---

[58] *Id.* at 538 (applying 11 *Del. C.* § 4332(i) (repealed)).
[59] *Id.*
[60] *McLaughlin v. Dep't of Elections for New Castle Cty.*, 1970 WL 104909, at *1 (Del. Super. Ct. Oct. 15, 1970).
[61] *McLaughlin v. Dep't of Elections and Johnson*, No. 728, 1970, slip op. at 6 (Del. Super. Ct. Oct. 19, 1970).  Ex. B to Answering Br.
[62] *Fonville v. McLaughlin*, 270 A.2d 529, 530 (Del. 1970).
[63] *Id.*
[64] *Id.*

and we decided that it was an "infamous crime."[65]  We did not question the Superior

Court's explicit ruling that misdemeanors could not be infamous crimes.

We next encountered Section 21 in 1976.  In *State ex rel. Wier v. Peterson*,[66]

the Attorney General sought a declaratory judgment that Edward Peterson was

constitutionally barred from holding public office.  Only felony convictions were

before the Court, but we did not even suggest the possibility that misdemeanor

convictions could be disqualifying.   We explained that *Fonville* established that

felony grand larceny was an infamous crime but held that "[i]t does not follow

. . . that [e]very felony is necessarily a crime of infamy."[67]  Instead, "the totality of

the circumstances in each case must be examined before a determination may be

made that a specific felony is infamous."[68]   We concluded that Peterson's

convictions for felony sodomy in Pennsylvania were disqualifying under

Section 21.[69]

We pause here to note that the Superior Court's analysis in this case depends

on an expansive reading of *Peterson*.  The court took note of *Peterson*'s examination

of the totality of the circumstances and observed that we described Section 21 as "a

character provision" establishing a "demanding norm."[70]  In turn, the court found

---

[65] *Id.* at 531.
[66] *State ex rel. Wier v. Peterson*, 369 A.2d 1076 (Del. 1976).
[67] *Id.* at 1079.
[68] *Id.*
[69] *Id.*
[70] *Capriglione*, 2021 WL 1784084, at *7.

that our "statement about the purpose of § 21 transcends the felony-misdemeanor distinction," concluding, in essence, that any crime could qualify as "infamous" if the conduct fell short of this important, yet indeterminate, norm.[71]  But, in our view, *Peterson* does not support this step in the court's analysis; the court's reading overlooks the fact that the totality of the circumstances test was employed in *Peterson* not to open the door to an extension of Section 21's reach to misdemeanors, but to determine whether the specific felonies of which Peterson was convicted were "infamous" within Section 21's meaning.

Returning to our review of this Court's prior encounters with Section 21 and their influence on the Superior Court, we note that in both *Fonville* and *Peterson* we addressed the scope of Section 21 without disturbing the Superior Court's holding that only felonies could be disqualifying.  These opinions led the Superior Court to decide in *Holloway v. State Dep't of Elections for New Castle County*[72] that we had blessed the decision of President Judge Stiftel and Judge Christie in *McLaughlin*. At issue in *Holloway* was a candidate for election to the General Assembly who had been convicted on misdemeanor counts of tax evasion and making false statements.[73] These offenses were quintessential examples of *crimen falsi*.  But, after quoting from

---

[71] *Id.* at *8.
[72] *Holloway v. State Dep't of Elections for New Castle Cty.*, 1992 WL 149511 (Del. Super. Ct. June 25, 1992).
[73] *Id.* at *1.

18

*McLaughlin*, *Fonville*, and *Peterson*, the Superior Court explained that "[r]elying on these precedents . . . plaintiff's misdemeanor convictions were not convictions for 'infamous crimes' as contemplated by the Delaware Constitution."[74]

This unbroken line of decisions continued in *Dorcy v. City of Dover Bd. of Elections*.[75] In *Dorcy*, the plaintiff sought a declaration that his Ohio misdemeanor convictions for sexual assault were not disqualifying under Delaware law.[76] The Superior Court made two holdings. First, the Court explained that it was "unwilling to overturn decisional law in this State and hold that a misdemeanor can ever be an infamous crime[.]"[77] Second, the Court found that the plaintiff's Ohio misdemeanor satisfied the elements of a Delaware felony and was disqualifying under Section 21.

We affirmed.[78] Our order explained that the plaintiff's Ohio conviction "would constitute the analogous crime in Delaware of attempted unlawful sexual contact in the second degree, a felony."[79] We then held that the plaintiff's specific felony was an "infamous crime" under Section 21.[80] While our disposition was brief, it did not disturb the Superior Court's reasoning that, under the felony-only doctrine

---

[74] *Id.* at *2 (internal citations omitted).
[75] *Dorcy v. City of Dover Bd. of Elections*, 1994 WL 146012 (Del. Super. Ct. March 25, 1994) *aff'd*, 642 A.2d 836 (Del. 1994) (TABLE).
[76] *Dorcy*, 1994 WL 146012, at *6.
[77] *Id.*
[78] *Dorcy v. City of Dover Bd. of Elections*, 642 A.2d 836, 1994 WL 151030 (Del. 1994) (TABLE).
[79] *Id.* at *1.
[80] *Id.*

developed in *McLaughlin*, *Fonville*, *Peterson*, and *Holloway*, the Ohio conviction at issue in *Dorcy* could only be disqualifying if it was a felony under Delaware law.[81]

Our most recent encounter with Section 21 came in 2008, when Governor Ruth Ann Minner requested an advisory opinion relating to the nomination of Bernard Pepukayi to the office of Family Court Commissioner.[82] Pepukayi had been convicted of two drug-related felonies shortly after turning 18.[83] We concluded that Pepukayi—who was 17 when he committed the crimes—was not disqualified under Section 21, quoting *Peterson* for the proposition that "not every felony is necessarily an 'infamous crime.'"[84] Inquiring into the circumstances of Pepukayi's felonies, we gave "considerable thought to our General Assembly's enactments that direct us to the manner in which the people's representatives believe Article II, Section 21 should be interpreted today."[85] We found that the General Assembly's stated goal of promoting "rehabilitation rather than retribution" for juvenile offenders was strong evidence that most crimes committed by minors are not "infamous."[86]

---

[81] To be clear, we do not suggest that our Orders in *McLaughlin* and *Dorcy* amounted to a tacit acceptance of the Superior Court's reasoning in the appealed decisions. We simply observe that the decisional law pertinent to this case has percolated through the Superior Court and this Court for more than five decades.

[82] *Advisory Opinion (Pepukayi)*, 950 A.2d at 652.

[83] *Id.*

[84] *Id.* at 653 (quoting *Peterson*, 369 A.2d at 1079).

[85] *Advisory Opinion (Pepukayi)*, 950 A.2d at 655.

[86] *Id.* at 655–657.

In sum, before this case, the Superior Court had consistently held in decisions dating to 1970 that only felonies can be considered "infamous" under Section 21. Meanwhile, the General Assembly's only activity in this area has been to enact a statute, § 7555(c)(1), that prevents felons from holding municipal offices as a default rule—that is, unless a town's charter says otherwise—but says nothing about misdemeanants. Thus, while it is true that we have never approved of the *McLaughlin* rule in a formal holding, settled Delaware law dictates one result. We therefore hold that only felonies can be considered "infamous" under Article II, Section 21 of the Delaware Constitution.

V

In closing, we observe that, when the delegates to the Convention of 1897 gathered in Dover, neither the city nor the State had a professional police force.[87] The Wilmington Police Department had only hired professional officers since 1891.[88] As a result, community police forces operated as "civil servants of general resort," and did not focus narrowly on crime control.[89] In 1897, the Delaware

---

[87] The State of Delaware, *History of the Delaware State Police*, https://dsp.delaware.gov/about-the-agency/ (last visited Sept. 28, 2021) ("On April 23, 1923, the General Assembly, at the request of the State Highway Department, enacted two laws that created the Delaware State Police.").

[88] The City of Wilmington, *WPD History,* https://bit.ly/3lvwFNU (last visited Sept. 28, 2021) ("In 1891, the Delaware State Legislature passed the Metropolitan Police Act, which professionalized the Wilmington Police Department and called for the hiring of officers based on their ability to perform the job, rather than political appointments.").

[89] Erik H. Monkkonen, *History of Urban Police*, 15 Crime & Just. 547, 557–558 (1992); William J. Stuntz, *The Collapse of American Criminal Justice* 30–31, 132–134 (2011) (describing low conviction numbers and "remarkably small" prison populations during the end of the 1800s).

criminal statutes enumerated fewer than 75 offenses.[90]  Today, by contrast, Title 11 of the Delaware Code lists more than 350 specific crimes and other parts of the Code enumerate many more.[91]  This growth is not unique to our state: nationwide, the authorities file approximately 13 million misdemeanor cases per-year, a number that corresponds to 42.6-per-1000 people.[92]

When coupled with the State's view that any conviction, given certain facts, can disqualify a citizen from public service, our modern tendency to sweep previously unregulated conduct into the criminal law's purview would extend Section 21's reach far more broadly than originally intended.  We believe that the decisions of the General Assembly, the Superior Court, and this Court have correctly recognized this risk when interpreting Section 21.  We therefore hold that only felonies can be "infamous" crimes under the Delaware Constitution.

VI

As previously stated in our July 16, 2021 order, we reverse the judgment of the Superior Court.

---

[90] *See* Del. C. 1852, tit. 20, chs. 126-132 (1893).

[91] 11 *Del. C.* §§ 501-1474; *See, e.g.*, 16 *Del. C.* §§ 4701–4799 (Controlled Substances Act).

[92] Sandra G. Mayson & Megan T. Stevenson, *Misdemeanors By The Numbers*, 61 B.C. L. Rev. 971, 998 (2020) (excluding non-DUI traffic offenses); *cf.* William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 511 (2001) (arguing that state codes "criminalize everything and everyone[.]"); *see also* Neil M. Gorsuch, *A Republic, If You Can Keep It* 242, 247–248 (2019) ("Our criminal justice system suffers from its own grave problems.  According to the Heritage Foundation, the federal statutory books today contain more than an estimated 4,500 criminal laws, most of very recent vintage.  And that doesn't even begin to account for criminal laws at the state and local levels[.]").

**VAUGHN**, Justice, concurring:

I agree that "infamous crimes" in Article II, § 21 is limited to felonies and does not include misdemeanors. I join in the Court's opinion except for Part V. Part V is not relevant to my analysis of the case.